[No. 37078.   En Banc.   August 15, 1963.]

THE STATE OF WASHINGTON, *on the Relation of DuPont-Fort Lewis School District No. 7, Appellant,* v. LOUIS BRUNO, *as Superintendent of Public Instruction, et al., Respondents.**

*Reported in 384 P. (2d) 608.

*Skoog, Mullin & Cooper* and *Thomas R. Garlington*, for appellant.

*The Attorney General, Robert J. Doran* and *Bruce W. Cohoe, Assistants*, for respondents.

HAMILTON, J.—Appellant, DuPont-Fort Lewis School District No. 7, on December 17, 1962, applied to respondents, the State Superintendent of Public Instruction and the State Board of Education (hereafter referred to as the superintendent and board, respectively), for accreditation of a proposed senior high school to commence in September, 1963, with the then addition of a 12th grade. Pursuant to appellant's request, an early hearing was afforded by the board.[1]

On March 28, 1963, appellant appeared before the board, submitted oral and documentary evidence of compliance with academic, personnel, administrative, and physical facility standards as established by the board, and through counsel urged favorable action. The board, upon the recommendation of the superintendent, denied accreditation, and, on April 1, 1963, advised appellant of its findings, which were as follows:

"1. The Wendell B. Laughbon Senior High School presently is not offering secondary education through the twelfth grade;

"2. No dire and imperative need presently exists for high school facilities and program of secondary education in the DuPont-Fort Lewis School District No. 7;

"3. Adequate high school facilities exist in Clover Park School District No. 400, and additional facilities and programs may be more economically and reasonably provided within the boundaries of the Clover Park School District;

"4. The expenditure of federal and state funds for construction and operation of a senior high school in the DuPont-Fort Lewis School District No. 7 is unreasonable and not in the public interest."

[1]Board standards provide for consideration of applications for accreditation during its annual June meeting.

Appellant applied ex parte to the Superior Court of Thurston County for a writ of certiorari, seeking thereby judicial review of the denial of accreditation. In its petition, appellant asserted that the evidence and exhibits presented to the superintendent and the board at the March hearing established that the proposed high school will serve in excess of 36 students and meets and surpasses all standards as to curriculum, personnel, and physical facilities, and that denial of accreditation would cause loss of certain state funds, demoralize students, and force closure. Appellant further alleged that the superintendent and the board acted illegally and/or arbitrarily and capriciously in that, contrary to standard practice, they failed to (a) make available a senior high school report form; (b) make an examination of the school district and the proposed program; (c) make any findings relating to the academic qualifications of the proposed high school; and (d) properly construe appellant's application and board regulations, as such related to the school year for which accreditation was sought.

The superior court issued an alternative writ directed to respondents. In response to such writ, respondents filed an answer and a return, including a transcript of the proceedings before the board. Concurrently, respondents filed a motion to quash and dismiss appellant's action upon the grounds that (1) appellant failed to state a claim for which relief could be granted; (2) the court lacked jurisdiction of the subject matter; and (3) appellant lacked standing to maintain such action.

The superior court, relying upon *Okanogan Cy. School Dist. No. 400 v. Andrews*, 58 Wn. (2d) 371, 363 P. (2d) 129 (1961), granted respondents' motion to dismiss upon the grounds that it lacked jurisdiction over the subject matter. This appeal followed, appellant contending that the latter case of *State ex rel. Cosmopolis Consol. School Dist. No. 99 v. Bruno*, 59 Wn. (2d) 366, 367 P. (2d) 995 (1962) is controlling.

The *Okanogan* case, like the instant case, involved a denial of high school accreditation. We there held that (1)

the high school accreditation function of the board was essentially administrative or legislative in character, as distinguished from a judicial or quasi-judicial function; and (2) where the circumstances presented a remote, possibly inadequate high school serving less than 36 pupils, and the administrative definitions,[2] relating to accreditation of such high schools, patently permitted the exercise of discretion, in granting or denying accreditation, we would, absent statutory authority to the contrary, adhere to the limitations upon judicial review of nonjudicial functions imposed by RCW 7.16.040.[3] Accordingly, we declined jurisdiction.

The subsequent *Cosmopolis* case revolved about administrative action by school authorities in determining financial contributions between districts in a building program under RCW 28.56.010, *et seq.* We distinguished the *Okanogan* case and held, in substance, that (1) whether or not the administrative function involved be characterized as

---

[2] "TYPES OF ACCREDITATION

"*High School*

"Accreditation of high schools consists of two types—standard and probationary—as follows:

"*Standard Accreditation*:

"A school which meets all minimum standards shall be granted standard accreditation. High schools must have a minimum of 36 students in average daily attendance for accreditation. High schools having less than 36 A.D.A. may receive consideration for accreditation provided (a) that the county committee on school district organization, after study of all factors involved, submits recommendations to the Board, following which the Board shall determine that the high school is geographically remote and necessary; and (b) that the quality of the high school program meets established standards of the State Board of Education.

"Schools with less than 36 A.D.A. must apply annually for accreditation.

"*Probationary Accreditation*:

"(a) . . .

"(b) . . ."

[3] "A writ of review shall be granted by any court, except a police or justice court, when an inferior tribunal, board or officer, exercising judicial functions, has exceeded the jurisdiction of such tribunal, board or officer, or one acting illegally, or to correct any erroneous or void proceeding, or a proceeding not according to the course of the common law, and there is no appeal, nor in the judgment of the court, any plain, speedy and adequate remedy at law."

discretionary and nonjudicial, our courts possessed constitutional[4] and inherent power to review illegal or manifestly arbitrary and capricious action violative of fundamental rights; and (2) where the allegations in an application for writ of certiorari, if accepted as true, clearly demonstrate such a violation, courts should look to substance, rather than procedural form, and exercise their inherent power to review. Accordingly, we accepted jurisdiction.

We do not conceive the *Okanogan* and *Cosmopolis* cases to be irreconcilable. The *Okanogan* case represents a recognized judicial approach to reviewability of administrative actions revolving about nonjudicial functions which do not involve an alleged violation of fundamental rights, and which patently involve the exercise of administrative discretion. The *Cosmopolis* case, on the other hand, represents an accepted judicial approach to reviewability of administrative actions which, though discretionary and functionally nonjudicial, would, if illegally or arbitrarily and capriciously exercised, do violence to fundamental rights.

The essential touchstone, impelling invocation of the inherent or constitutional power of judicial review of nonjudicial administrative action, is the basic nature and extent or magnitude of the right involved coupled with the patency and character of the alleged violation.

Crucial then to a determination of whether appellant has, within the molds cast by the *Okanogan* and *Cosmopolis* cases, stated a claim upon which judicial review should be granted is the question of whether compliance with high school academic, personnel, and facility standards, by any school district serving more than 36 high school students, entitles such district to high school accreditation as a matter of fundamental right, regardless of other considerations. Stated another way: Does the board legally possess discretionary power to deny such an application for high school accreditation upon grounds other than failure to meet minimum attendance, academic, personnel, and facility standards?

[4] Article 4, § 6, Washington State Constitution.

We believe, a brief review of the powers and duties, respectively, of the superintendent, the board, and school districts, and their relationship one to the other, will be of assistance in answering the question presented.

Article 9, § 1, of the state constitution, imposes upon the state the paramount duty of making adequate provision for the education of all children residing within its borders. Article 9, § 2, commands the legislature to provide a general and uniform system of public schools, and Art. 3, § 22, entrusts to the superintendent supervisory authority over all matters pertaining to the public schools.

In keeping with the constitutional provisions, the legislature has, by RCW 28.02.020, provided that administration of the public school system shall be carried out by the superintendent, the board, county superintendents, county boards (RCW 28.20), and school districts.

RCW 43.11.030 legislatively defines the powers and duties of the superintendent, including supervision over all public school matters; biennial reporting to the governor concerning the general condition of the public schools as related to attendance, building, financing, and plans for management and improvement; and acting as ex officio president of the board. In addition, the superintendent is enjoined to annually apportion state funds among the school districts (RCW 28.41.060); biennially certify budgetary estimates to the governor for submission to the legislature (RCW 28.41.040); represent the state in the receipt and administration of federal funds (RCW 28.47.020); cooperate and assist certain school districts in preparation of their budgets (RCW 28.63.100); and assist the state and county boards in performance of their duties relating to organization and reorganization of school districts (RCW 28.57.110).

RCW 43.63.010, *et seq.*, creates the board, provides for its composition (two members from each congressional district elected by the school district directors), and defines its powers and duties, among which are to define "education" insofar as the state's constitutional obligations be concerned; unify the work of the public school system; outline courses of study for the various departments of the

common school system, including high schools; prescribe such rules for the general government of the common schools as will promote regularity of attendance, efficiency, and the true interests of the school system; prescribe rules for the classification of high and nonhigh school districts; and to examine and accredit secondary schools. Other duties embrace planning, rule making, and reviewing in connection with administration of state funds (RCW 28.19, 28.41, 28.47, 28.48), the administration of federal funds (RCW 28.47.120), and organization and reorganization of school districts (RCW 28.56, 28.57).

RCW 28.19 provides for the election of the county superintendent of schools and accords to such office general supervision over and coordination of the common schools of his county. Among other duties, he is enjoined to make annual reports to the state superintendent; assist districts in preparation of their budgets; prepare a county budget; and submit statistical data to the state board to assist in performance of its duties with respect to apportionment of funds.

RCW 28.20 creates county boards of education, which boards, among other duties, advise with and assist the county superintendent in the performance of his budgetary duties.

RCW 28.57 relates to school district organization and reorganization, and creates county committees on school district organization. Such county committees, among other duties, initiate, receive, consider, and recommend, subject to review by the state board, proposed changes in school district organization and reorganization within their respective counties; coordinate with the state board and report to the state superintendent concerning the urgency and need for local school facilities.

RCW 28.58 constitutes a school district as a body corporate for public purposes, and vests it generally with power and authority to establish, construct, maintain, budget for and administer schools upon the local level. It is, in effect, a corporate arm of the state for the administration of the constitutionally required school system. In car-

rying out its function, a district is authorized to condemn, purchase, and sell realty for school purposes; construct needed school facilities; employ and discharge teachers; provide text books, supplies and transportation to pupils; determine the necessity for excess tax levies and the submission thereof to the district electorate for approval; incur, with voter approval, bonded indebtedness; apply for state assistance and apportionment funds, and to make rules and regulations for the government of the common schools under its charge.

■ From the foregoing partial and capsule review of existing constitutional and statutory provisions, it is apparent that, in keeping with the state's constitutional obligation to provide an educational program, the legislature has promulgated an integrated system of agencies for the acquisition, construction, financing, administration, supervision, maintenance and operation of public schools. The basic components of the system are the state and the county superintendents, the state and county boards and committees, and the school districts. Administratively and functionally they are correlated and interdependent upon one another.

■ The system is infused with a public interest, not only from the standpoint of providing adequate and effective academic training to children, but also from the standpoint of the most effective, efficient, and economically feasible investment of public funds. Although local autonomy, in the evaluation of local needs and the investment of local funds, is fostered and encouraged, the legislature has recognized, particularly in the areas of future planning, construction, and finance, that total autonomy must yield to the interests of the educational system as a whole and the constitutional obligation of the state to maintain such.

Against this backdrop then, we turn to the question of whether a nonhigh school district is entitled as a matter of substantive right to accreditation of a projected high school meeting accepted academic, personnel, attendance, and facility standards, regardless of or contrary to overlying considerations of necessity and economic feasibility.

The legislature divided school districts into two divisions to be known as high school districts and nonhigh school districts, and defined a high school district as one maintaining a 4-year high school course, or a high school accredited by the state board though offering less than a 4-year course (RCW 28.01.040). The board is empowered to prescribe rules and regulations governing the classification of school districts as high school and nonhigh school districts (RCW 43.63.150); to outline courses of study for the various departments of the common schools, including high schools (RCW 43.63.140(6)); and to prescribe rules for the general government of the school system consistent with efficiency and unity (RCW 43.63.140(6)(10)).

Accreditation, in addition to being a badge of academic proficiency and a factor in the classification of districts, is also made a qualification for participation in a certain proportion of the common school fund, apportionment of which is, in some respects, delegated to the superintendent (RCW 28.41.070(3)). When a district expands, other state and state administered federal funds become potentially involved, over which the board exercises some responsibility (RCW 28.47.010, *et seq.*). The board is empowered to "*Examine* and accredit secondary schools" (RCW 43.63-.140(5)). (Italics ours.) The legislature specified no particular guidelines or standards for accreditation. Neither did the legislature provide for any appeal or review in the event of a denial of accreditation.

Under the foregoing circumstances, we do not believe the legislature intended that the board's *examination*, for accreditation purposes, would be limited to a purely ministerial determination of whether or not a projected high school proposed for accreditation met certain academic, personnel, attendance, and facility standards. Rather, we are convinced, the legislature intended the board's consideration of such a proposal to be in terms of such standards together with an over-all evaluation of such factors as necessity, economic effect, and future planning.

We are, therefore, satisfied that appellant district is not entitled, as a matter of substantive right, to accreditation

of a projected high school irrespective of considerations such as expressed in the findings of the board.

We conclude the trial court correctly applied the approach to judicial reviewability of respondents' action as enunciated in the *Okanogan* case.

The judgment of dismissal is affirmed.

OTT, C. J., DONWORTH, FINLEY, WEAVER, HUNTER, and HALE, JJ., concur.

HILL, J., dissents.

ROSELLINI, J. (concurring)—I concur in the result. For the reasons which I stated in the *Cosmopolis* cases (59 Wn. (2d) 366 (dissent at p. 371), 367 P. (2d) 995; and, 61 Wn. (2d) 461 (concurring at p. 472), 378 P. (2d) 691), I believe these cases cannot be reconciled with *Okanogan Cy. School Dist. No. 400 v. Andrews*, 58 Wn. (2d) 371, 363 P. (2d) 129.